## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRAD THOMASCIK, derivatively on behalf of Nominal Defendant PIEDMONT LITHIUM INC. F/K/A/ PIEDMONT LITHIUM LIMITED,<br><br>Plaintiff,<br><br>vs.<br><br>KEITH D. PHILLIPS, BRUCE CZACHOR, GREGORY SWAN, JEFFREY ARMSTRONG, JORGE M. BERISTAIN, TODD HANNIGAN, IAN MIDDLEMAS, ANASTASIOS ARIMA, PATRICK H. BRINDLE, CLAUDE DEMBY, SUSAN JONES and LEVI MOCHKIN,<br><br>Defendants,<br><br>and<br><br>PIEDMONT LITHIUM INC. F/K/A/ PIEDMONT LITHIUM LIMITED,<br><br>Nominal Defendant. | Civil Action No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Brad Thomascik ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant, Piedmont Lithium Inc. f/k/a/ Piedmont Lithium Limited ("Piedmont" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers, seeking to remedy defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Piedmont with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    INTRODUCTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Piedmont against certain current and/or former officers and directors of Piedmont based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.      Nominal Defendant Piedmont is an early-stage project company focused on developing an integrated lithium business. The Company's core asset, and centerpiece of its operations, is its wholly owned interest in a lithium project located in Gaston County, North Carolina, in an area that has historically produced much of the western world's lithium (the "Carolina Lithium Project"). From June 2018 through July 2021 (the "Relevant Period"), the Company was exclusively focused on proving the Carolina Lithium Project's potential.

3.      Piedmont holds a 100% interest in the Carolina Lithium Project which is located within the Carolina Tin-Spodumene Belt in North Carolina. The area provided most of the western world's lithium between the 1950s and 1980s and is described as one of the largest lithium regions in the world.

4.      Through the Carolina Lithium Project, the Company planned to build: (i) an open-pit mine; (ii) a spodumene concentrator; and (iii) a chemical plant to convert the spodumene mineral found in the region into lithium hydroxide, an important input in electric vehicle manufacturing.

5.      Before embarking on the Carolina Lithium Project, the Company first needed to obtain required federal, state, and local permits and a zoning variance. Of particular importance to this derivative lawsuit, this included both the North Carolina state mining permit to operate the mine, and zoning approval from the Gaston County Board of Commissioners (the "Commissioners") for the mine and concentrator property. Without the required permits and zoning variance, the Carolina Lithium Project could not go forward.

6.      Throughout the Relevant Period, the Individual Defendants (defined below) issued a series of materially false and misleading statements and omitted to disclose material facts regarding the Carolina Lithium Project.  Among other things, the Individual Defendants repeatedly and falsely represented that: (i) the Company purportedly had strong local government support for the Carolina Lithium Project; (ii) the Company was actively engaged in discussions with relevant authorities regarding the zoning changes that needed to be made for the Carolina Lithium Project; and (iii) the Company would file for the necessary North Carolina state mining permit and zoning variance in its stated timelines, which the Individual Defendants often indicated was merely months away from occurring.

7.      In other words, stockholders were led to believe that the Company had met with the Commissioners, had their support, and would have no major issues rezoning the property for its planned use. Moreover, by stating that the Company was mere months away from applying for a state mining permit and rezoning variance, the Individual Defendants led stockholders to believe

that they had ensured that the Company had a detailed plan in place to obtain the necessary permits and variance and was on track with its stated timelines. Unbeknownst to stockholders, none of this was true.

8.      While they concealed the true state of affairs regarding the Carolina Lithium Project, the Individual Defendants raised approximately $193 million for the Company through various public equity offerings, which was used for strategic investments in other projects, among other things. They also reached an agreement with Tesla, Inc. ("Tesla") to supply it with spodumene concentrate.

9.      On July 5-6, 2021, just two weeks before defendants Keith D. Phillips ("Phillips"), the Company's longtime President and Chief Executive Officer ("CEO") and a member of the Board, and Patrick H. Brindle ("Brindle"), the Company's Carolina Lithium Project Manager and then-Chief Development Officer ("CDO"), were set to make the Company's public presentation before the Commissioners on July 20, 2021, both Phillips and Brindle completed their first reported sales of Piedmont stock, together selling approximately $3.46 million worth of their personally-held Piedmont stock at prices close to Relevant Period highs.

10.     Just two weeks after those well-timed stock sales, on July 20, 2021, before the markets opened, Piedmont stockholders were surprised when a *Reuters* article[1] revealed – for the first time – that: (i) the Commissioners had in fact not previously been spoken with by Piedmont, or presented with any information about the Carolina Lithium Project; (ii) the Carolina Lithium Project did not benefit from strong local government support; (iii) five out of seven Commissioners, who control zoning changes, stated they may block or delay the Carolina Lithium

---

[1] Ernest Scheyder, In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors, REUTERS (July 20, 2021), https://www.reuters.com/business/energy/push-supply-tesla-piedmont- lithium-irks-north-carolina-neighbors-2021-07-20/.

Project because Piedmont had not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected; (iv) the Company had not yet applied for a state mining permit or a zoning variance in Gaston County; and (v) the Company's state mining permit and rezoning application timelines were unrealistic and lacking in any basis because the Company had yet to meet with the Commissioners and discuss it with them.

11.     Thus, far from the purported "[s]trong local government support" the Individual Defendants had touted, one of the Commissioners clarified: "***This has been the worst rollout of a project from a company I've ever seen***."

12.     The July 20, 2021 *Reuters* article included a quote from Phillips, dismantling the notion that the Company was actively engaged with the Commissioners or that its state mining permit and rezoning application timelines were ever feasible: "Maybe it would have been better had (commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them[.]" And, as later confirmed during the Company's presentation that evening, the Commissioners had been "completely left in the dark."

13.     The *Reuters* article also stated that the Company needed to have its state mining permit "in hand" before it could apply for rezoning – a death knell to the Company's rezoning application timelines since the state mining permit review process could "stretch for more than a year" – and the Company had still not filed the application.

14.     In response to this news, the price of Piedmont stock fell by $12.56 per share over the trading day, plummeting nearly ***20%***, to close at $50.52 per share on July 20, 2021.

15.     These revelations precipitated the filing of securities fraud class actions in this District against Piedmont and certain of the Individual Defendants named herein, which were

eventually consolidated under the caption *In re Piedmont Lithium Inc. Securities Litigation,* Case No. 21-cv-04161 (E.D.N.Y.) (the "Securities Action").

16.     There is reason to doubt that at least half of the members of the Company's current Board could disinterestedly and/or independently respond to a litigation demand in connection with the false and misleading representations challenged herein because, among other things, the Board members were aware of significant non-public developments in the Company's core business, the Piedmont Lithium Project, and the Company's deteriorating relationship with local officials which would hinder the permitting process. As a result, at least half of the members of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law, and this derivative action should proceed.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) as complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.     THE PARTIES

### A.     Plaintiff

19.     Plaintiff Brad Thomascik has continuously owned his Piedmont stock since April 2021. Plaintiff is a citizen of Ohio.

### B.     Nominal Defendant

20.     Nominal Defendant Piedmont is a Delaware corporation with its principal executive offices located at 32 North Main Street, Suite 100 Belmont, North Carolina 28012. The Company's common stock trades on the NASDAQ under the symbol "PLL." On May 17, 2021, in connection with Piedmont's redomiciliation from Australia to the United States, holders of Piedmont's ADSs received one share of common stock for each ADS. Piedmont is a citizen of Delaware and North Carolina.

### C.     The Individual Defendants

21.     Defendant Phillips has served as the President and CEO of the Company, and as a member of the Board, since July 2017. He is named as a defendant in the Securities Action. Upon information and belief, Phillips is a citizen of Florida.

22.     Defendant Bruce Czachor ("Czachor") has served as the Company's Vice President and General Counsel since December 2018. He is named as a defendant in the Securities Action. Upon information and belief, Czachor is a citizen of New Jersey.

23.     Defendant Gregory Swan ("Swan") has served as Secretary of the Company since October 2012 and previously served as Chief Financial Officer ("CFO") of the Company until approximately June 2021. He is named as a defendant in the Securities Action. Upon information and belief, Swan is a citizen of Australia.

24.     Defendant Jeffrey Armstrong ("Armstrong") has served as a director of the Company since August 2018 and as Chairman of the Board since May 2021. Upon information and belief, Armstrong is a citizen of North Carolina.

25.     Defendant Jorge M. Beristain ("Beristain") has served as a director of the Company since May 2018. Upon information and belief, Beristain is a citizen of New York.

26.     Defendant Susan Jones ("Jones") has served as a director of the Company since June 2020. Upon information and belief, Jones is a citizen of Canada.

27.     Defendant Claude Demby ("Demby") has served as a director of the Company since June 2021. Upon information and belief, Demby is a citizen of North Carolina.

28.     Defendant Todd Hannigan ("Hannigan") served as a director of the Company from February 2021 until he retired on April 22, 2022. Upon information and belief, Hannigan is a citizen of Australia.

29.     Defendant Ian Middlemas ("Middlemas") served as a director of the Company from September 2009 to December 2020. Upon information and belief, Middlemas is a citizen of Australia.

30.     Defendant Anastasios Arima ("Arima") served as a director of the Company from October 2016 to June 2021. Upon information and belief, Arima is a citizen of North Carolina.

31.     Defendant Levi Mochkin ("Mochkin") served as a director of the Company from April 2006 to June 2021. Upon information and belief, Mochkin is a citizen of Australia.

32.     Defendant Brindle joined the Company in January 2018 and served as the Company's Carolina Lithium Project Manager and CDO.  In March 2022, Brindle was appointed to serve as the Company's Executive Vice President and Chief Operating Officer.  Upon information and belief, Brindle is a citizen of North Carolina.

33.     Defendants Phillips, Czachor, Swan, Armstrong, Beristain, Hannigan, Middlemas, Arima, Mochkin, Demby, Jones and Brindle are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

37.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or

officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## V.   FACTS

### A.   Piedmont's Background and the Carolina Lithium Project

39.     Nominal Defendant Piedmont is a pre-revenue, early-stage project company focused on developing an integrated lithium business. The centerpiece, and core asset, of Piedmont's operations is its wholly owned interest in a lithium project located within the Carolina Tin-Spodumene Belt and along trend to the Hallman Beam and Kings Mountain mines. This area historically produced much of the western world's lithium between the 1950s and 1990s.

40.     Piedmont secured the exploration rights and initial land position in mid-2016. At the start of the Relevant Period, Piedmont was exclusively focused on proving the Carolina Lithium Project's potential.

41.     Piedmont's business plan involved using the spodumene mineral found in the region to make spodumene concentrate ("SC6") that could then be converted into lithium hydroxide, a critical component for electric vehicle manufacturing. Specifically, this process would be completed in one integrated location in Gaston County, North Carolina, through the use of a lithium hydroxide chemical plant supplied with spodumene concentrate from an open-pit mine and concentrator.

42.     To effectuate its business plan, the Company needed to complete various steps, which included, among other things, the following:

a.      completing exploration drilling on its initial land position and securing additional land leases for further exploration;

b.      undertaking necessary technical studies to assess the economic potential of the Carolina Lithium Project;

c.      completing required permitting and zoning activities;

d.      completing required financing activities;

e.      completing construction of Piedmont's lithium mining and processing activities; and

f.      beginning lithium mining and processing activities to supply electric vehicle and battery storage markets.

43.    On March 16, 2018, in a registration statement filed with the SEC on Form 20-F, the Company acknowledged that "[p]rior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities." The Form 20-F explained that the Company's "ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on [its] ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities."

44.    One of the necessary conditions for Piedmont to successfully commercialize its business plan was for it to secure the required permits, and complete rezoning activities. Put another way, the Company would not be able to engage in lithium mining and processing activities unless it: (i) obtained the required permits; and (ii) completed the required rezoning activities.

45.     By mid-2018, the Company had received a general permit from the North Carolina Department of Environmental Quality ("DEQ") for drilling exploration activities for the Carolina Lithium Project.

46.     To support permitting activities on the Carolina Lithium Project, the Company retained HDR Engineering. As represented to stockholders in the Company's Form 6-K filed on July 19, 2018, HDR Engineering completed a critical issues analysis of the Carolina Lithium Project in February 2018 which identified the various local, state, and federal permits that the Company would need to commence mining and concentrator activities. The Individual Defendants knew which local, state, and federal permits and rezoning activities the Company was required to obtain and/or receive approval for in order to commence Piedmont's mining and concentrator activities for lithium in North Carolina.

## B.     The North Carolina State Mining Permit and County Zoning Approval

47.     Among the necessary permitting activities was the North Carolina state mining permit from the North Carolina DEQ Division of Energy, Mineral, and Land Resources. Pursuant to G.S. §74-50 of the North Carolina Mining Act of 1971 ("NC Mining Act" or the "Act"), a mining operator must obtain an operating permit covering the affected land in order to engage in mining in that area. G.S. §74-51 of the Act requires the prospective operator to submit an application containing information regarding operation of the mine and a reclamation plan meeting the requirements of G.S. §74-53 for the restoration of all affected land once mining is complete. A permit will not be issued until a reclamation plan has been approved.

48.     Information required in the permit application includes: materials to be mined, method of mining, expected depth of the mine, size of the mine, intended plan for overall mine reclamation, and mine maps showing property lines of the tract or tracts of land on which the

proposed mining activity is to be located, existing or proposed permit boundaries with geographic controls labeled, outline and acreage of all pits/excavations, and outline and acreage of all stockpile areas.

49.     The current state mining permit application also includes the following note on the first page of the application: "It is recommended that you contact the appropriate Regional Office or the Raleigh Central Office for a PRE-APPLICATION MEETING to discuss your intentions and address any questions." (Emphasis in original.)

50.     The state mining permit review process includes the solicitation of comments from at least six other state and federal agencies and may also include additional requests for information. Additionally, if it is determined that significant public interest exists, a public hearing on the application for a mining permit will be held before a final decision is made on the application and the DEQ must give full consideration to all comments submitted at the public hearing.

51.     G.S. §74-65 of the Act cautions that no provision shall be construed to supersede or otherwise affect or prevent the enforcement of any zoning regulation that is not in direct conflict with the Act. Pursuant to a 2017 amendment, any newly issued mining permit is to be issued for the life of the site or lease term.

52.     The necessary zoning activities for development of the mine included obtaining approval for a variance from the Gaston County Board of Commissioners for rezoning the Carolina Lithium Project's mine and concentrator property.

53.     The Board of Commissioners is the governing body for Gaston County's unincorporated areas and makes the final decision for all rezoning cases. In 1977, the Commissioners, by ordinance, created the Gaston County Planning Board ("Planning Board"), which may make recommendations on rezoning cases to the Commissioners, although final say

remains with the Commissioners. Pursuant to Section 4.2 of the Gaston County Unified Development Ordinance ("UDO"), the Commissioners have the power to, among other things: appoint members to the Planning Board and Gaston County Board of Adjustment; initiate amendments to the UDO; review recommendations of the Planning Board; and make final decisions on applications for amendments to the UDO.

54.     Pursuant to Section 6.5 of the UDO, the Conditional District zoning process allows for the establishment of specific uses that, because of their nature or scale, have particular impacts on both the immediate area and the community as a whole. The rezoning of any parcel of land to a Conditional District must be in compliance with all other plans and regulations adopted by the Commissioners. According to the UDO at Sections 6.5 and 5.16.5, the development of these uses cannot be predetermined or controlled by general district standards and a Conditional District zoning application should be interpreted to be applicable in all underlying zoning districts and regulated uses where permitted by right or by special use permit.

55.     The Conditional District rezoning review process outlined in Section 5.16.5 of the UDO includes the opportunity for the Planning Board to review and make a recommendation on the application. If the Planning Board does not make a recommendation, the application is forwarded to the Commissioners without one. The Commissioners then may approve the application, deny the application, approve the application with modifications mutually agreed to by the applicant and the Commissioners, or submit the application to the Planning Board for further study and to make a report to the Commissioners.

56.     As defendant Phillips later stated: ***"We've known from day one, we can't do anything without [the Commissioners] rezoning this property – full stop." And "[w]e can't do***

*anything without . . . receiving a North Carolina state mining permit – we've known that all along*."[2]

57.     On June 14, 2018, the Individual Defendants began to issue positive statements about the Carolina Lithium Project to assure stockholders that the Company had the necessary local government support, which was critical for approval. To that end, in a press release issued that day, the Individual Defendants discussed Piedmont's strategic North Carolina location, stating that the Company will benefit from "*[s]trong local government support*."

58.     The Individual Defendants also provided a timeline for the filing of the necessary permits and other required approvals. On July 19, 2018, the Individual Defendants represented that the state mining permit application would be submitted by April 2019. The Individual Defendants reaffirmed this timeline in a September 13, 2018 press release.

59.     Also on September 13, 2018, the Individual Defendants informed stockholders that the Carolina Lithium Project's planned mine and concentrator property would need to be rezoned from agricultural use to industrial use "prior to a construction decision." While the Individual Defendants told stockholders that the Company "held initial meetings with the Gaston County planning office and the Economic Development Commission of Gaston County" and that they were "not aware" of any reason why rezoning would not be granted, they omitted to disclose that they had not yet discussed with, or even presented any of the Company's plans to, the Commissioners – *i.e.*, the final rezoning decision makers for all rezoning cases.

60.     In subsequent positive statements, the Individual Defendants further highlighted the stage of permitting and approvals for the Carolina Lithium Project and the Company's

---

[2] All emphasis, unless otherwise noted, is added.

purported engagement with local, state and federal regulators. Again, no disclosure was made that they had yet to discuss the Company's plans with, or present them to, the Commissioners.

61.     Throughout the Relevant Period, the Individual Defendants repeatedly provided a timeline for the overall project development and the Company's filing of the all-important state mining permit. For example, in August 2019, the Individual Defendants represented that a "mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months."

62.     The Individual Defendants again represented in early 2020 that "the future of Piedmont is bright and we anticipate positive developments in the coming weeks and months" and that "[p]ermitting activities for the Mine/Concentrator are well advanced" and a "mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months."

63.     The Individual Defendants did not disclose that they had not yet met with or discussed the Company's plans with the Commissioners such that they had no good faith basis or reasonable belief to provide the stated timelines. Indeed, as stockholders ultimately learned: (i) the Company could not submit its rezoning application until it first had the state mining permit in hand; (ii) the state mining review process could stretch for more than a year; and (iii) the Company had not yet submitted the state mining application.

          **C.**    **Piedmont Completes Multiple Equity Offerings and Enters Into an Agreement with Tesla**

64.     Prior to the disclosure of any adverse information regarding the Carolina Lithium Project, the Individual Defendants took advantage of the artificial inflation in the price of the Company's stock and completed several public equity offerings.

65.     On June 11, 2020, under the Individual Defendants' direction, Piedmont completed a public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on June 9, 2020, which incorporated by reference certain other filed documents (the "June 2020 Registration Statement"), pursuant to which the Company sold 2,065,000 ADSs to the public at $6.30 per ADS (the "June 2020 Offering"). The June 2020 Offering generated aggregate gross proceeds totaling approximately US$13.0 million. The June 2020 Offering documents stated that the Company intended to use the net proceeds from the June 2020 Offering to continue development of the Carolina Lithium Project, including permitting.

66.     The positive assessments of the Carolina Lithium Project's progress caught the attention of others as well. For example, on September 28, 2020, the Individual Defendants caused Piedmont to announce that an agreement was reached to supply Tesla with spodumene concentrate, conditional upon Piedmont and Tesla agreeing to a start date for SC6 deliveries between July 2022 and July 2023. The agreement called for an initial five-year term, with an option for a second five-year term by mutual agreement. Defendant Phillips commented: "We will now accelerate our mine/concentrator development to support Tesla's plans[.]"

67.     On October 23, 2020, the Individual Defendants caused the Company to complete another public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on October 22, 2020, which incorporated by reference certain other filed documents (the "October 2020 Registration Statement"), pursuant to which the Company sold 2.3 million ADSs to the public for $25.00 per ADS (the "October 2020 Offering"). The October 2020 Offering generated aggregate gross proceeds of $57.5 million. The October 2020 offering documents stated that the Company intended

to use the net proceeds from the October 2020 Offering to continue development of the Carolina Lithium Project, including permitting.

68.     On March 25, 2021, the Individual Defendants caused Piedmont to complete yet another public equity offering through a shelf-registration statement filed with the SEC on Form F-3 and a final prospectus filed with the SEC on Form 424B5 on March 24, 2021, which incorporated by reference certain other filed documents (the "March 2021 Registration Statement" and together with the June 2020 Registration Statement and October 2020 Registration Statement, the "Registration Statements"), pursuant to which the Company sold 1.75 million ADSs to the public at $70.00 per ADS (the "March 2021 Offering"). The March 2021 Offering generated $122.5 million in aggregate gross proceeds. The March 2021 Offering documents stated that the net proceeds from the March 2021 Offering would be used to, among other things, continue development of the Carolina Lithium Project, including permitting.

### D.     The Truth is Revealed

69.     On July 20, 2021, before market hours, *Reuters* published an article entitled "In push to supply Tesla, Piedmont Lithium irks North Carolina neighbors" which reported – for the first time – that contrary to the Individual Defendants' public representations, Piedmont had not previously spoken with or consulted the Commissioners about the required zoning variance and the Carolina Lithium Project. Specifically, *Reuters* reported that:

> In its quest to build one of the largest lithium mines in the United States, Piedmont Lithium Inc has overlooked one crucial constituency: its North Carolina neighbors.
>
> Piedmont last autumn signed a deal to supply U.S. electric automaker Tesla Inc with lithium sourced from its deposits in North Carolina, sending the company's stock up tenfold.

*       *       *

The company, however, has not applied for a state mining permit or a necessary zoning variance in Gaston County, just west of Charlotte, despite telling investors since 2018 that it was on the verge of doing so.

Five of the seven members of the county's board of commissioners, who control zoning changes, say they may block or delay the project because Piedmont has not told them what levels of dust, noise and vibrations will occur, nor how water and air quality would be affected.

"Piedmont has sort of put the proverbial cart before the horse," said Tom Keigher, chair of the board of commissioners. "Why in the world would they make this deal with Tesla before they even have approval for the mine?"… "We finally have a project to debut and really talk about," said Keith Phillips, Piedmont's chief executive officer.

"Maybe it would have been better had (commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them, until now." The deteriorating relationship between Piedmont and county leaders reflects broader tension in the United States as resistance to living near a mine clashes with the potential of EVs to mitigate climate change.…

The company originally planned to put its chemical plant in a neighboring county, but now intends to build it near the mine, a step that should reduce truck traffic. Piedmont also plans to crush rock in the mine pit, alleviating dust, and incorporate solar power.

\*          \*          \*

In September 2018, Piedmont told investors it expected to obtain permits by the end of 2019. In August 2019, executives said they would apply for permits and rezoning "in the coming months."

Piedmont said both times it was "not aware" of any reason why the county would not approve zoning changes, even though it had yet to present any information to commissioners. In December, Piedmont said it expected to receive local zoning approval before the end of June.…

Piedmont had been set to meet with commissioners in March, but canceled with three days' notice, further straining the relationship. Piedmont said it canceled that meeting in order to further refine its plans.

"This has been the worst rollout of a project from a company I've ever seen," said Chad Brown, a commissioner who opposes the mine.

\*          \*          \*

The North Carolina Department of Environmental Quality, which issues mining permits, said it expects an application "in the near future."

State officials added their review process could stretch for more than a year as they solicit comments from at least six other state and federal agencies.

"I'm not even going to accept an application from Piedmont for rezoning until they have their state permit in hand," said Brian Sciba, director of Gaston County's planning and zoning office.

\*       \*       \*

While some landowners are prepared to sell if the offer is enticing enough, others say Piedmont has bullied them.

"They told me that if I don't sell, they'll just mine around my property," said Emilie Nelson, whose 14 acres Piedmont has tried to buy since 2017.

Piedmont said it was unaware if one of its contractors made the alleged threat, but did not authorize or condone it.

"We always deal respectfully with folks," said Patrick Brindle, Piedmont's vice president of project management….

Landowners said they would prefer Piedmont only build a processing plant and rely on a foreign mine for lithium supply. Livent Corp (LTHM.N) and Albemarle Corp (ALB.N) operate lithium processing plants in the county that source the metal from South America.

Piedmont, which recently bought stakes in Quebec and Ghana lithium projects, said it prefers to mine and process the metal at the Gaston County site.

Piedmont's arrangement with Tesla has done little to impress locals. More than 1,500 have signed a petition asking officials to block the mine. "There's no doubt the mine would benefit our country and the green energy industry," said Tracy Philbeck, a commissioner. "But it would have a negative impact on our community."

70.    In response to this news, the price of Piedmont stock fell by $12.56 per share over the trading day, or nearly **20%**, to close at $50.52 per share on July 20, 2021.

71.    Later that evening, on the same date the *Reuters* article was published, Piedmont finally presented the Carolina Lithium Project to the Commissioners – its first time doing so, and after cancelling the prior scheduled March 9, 2021 presentation on three days' notice.

72.    During the presentation, defendant Phillips confirmed: "We've known from day one, we can't do anything without [the Commissioners] rezoning this property – full stop." And

"[w]e can't do anything without . . . receiving a North Carolina state mining permit – we've known that all along."

73.     Defendant Phillips conceded: "we weren't ready to present in March. We didn't know our plans and very important components that are now part of our plan weren't finalized then[.]" Indeed, defendant Phillips further admitted: "we haven't done as good a job – and I blame myself–with the community, the Commissioners, et cetera[.]"

74.     In response, Commissioner Tracy Philbeck ("Commissioner Philbeck") remarked:

> I do think the rollout of this as far as grassroots level, to put it politely, has not been good. I think you've missed an opportunity there and I think you're going to have to work from behind. I think it's going to be much easier to get $840 million [the estimated total capital investment for the Carolina Lithium Project] than I think it's going to be to get community support. . . So, I'm a little disappointed in that. I cannot stress enough how big of an opportunity I think has been missed there. And in my [soon- to-be] 14 years . . . on the board, out of all the companies we've dealt with from all around the world and in America, no company that I've ever dealt with has . . . left such a bad taste in our citizens' mouths and even the Commission to start out with. . . I think that it's going to be a very high bar – and it will all be to null – if you can't get over that.

75.     Commissioner Philbeck went on to confirm: "we've been completely left in the dark."

76.     Following these disclosures, an Evercore ISI analyst report dated July 21, 2021 shared the disappointment: "The miss here, in our view, was that [Piedmont] . . . had not previously engaged with county commissioners on the project / benefits etc." The report further noted that "[t]he zoning is crucial for the project to proceed" and declared that the 'honeymoon' is over[.]"

## VI.   THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

77.     Between June 14, 2018 and July 20, 2021, *i.e.*, the Relevant Period, the Individual Defendants made a series of materially false and misleading statements. In addition to the statements identified above, the materially false and misleading statements include the following.

### A.      False Statements Regarding the Company's Relationship with State and County Regulators

78.      On June 14, 2018, the Individual Defendants caused the Company to issue a press release entitled "Piedmont Lithium Announces Maiden Mineral Resource," which stated that the North Carolina Project will benefit from "[s]trong local government support."

79.      As later admitted by defendant Phillips, at no time did Piedmont have "strong local government support" for the Carolina Lithium Project. As stockholders later learned, Piedmont had not consulted the Gaston County Commissioners before this statement was made nor provided them with details of the Company's plans, including the levels of dust, noise and vibrations that were expected to occur, or how water and air quality were expected to be affected. Indeed, as defendant Phillips later conceded: "We've known from day one, we can't do anything without [the Commissioners] rezoning this property" and "we haven't done as good a job – and I blame myself – with the community, the Commissioners, et cetera[.]" Further, this statement was later revealed to be false as five out of the seven Commissioners stated they may block or delay the Carolina Lithium Project, with one underscoring: "***This has been the worst rollout of a project from a company I've ever seen***." Thus, the Individual Defendants had no basis to claim that the Carolina Lithium Project benefitted from "[s]trong local government support."

80.      On September 13, 2018, the Individual Defendants caused the Company to issue a press release entitled "Updated Scoping Study Improves Project Economics" which stated, in pertinent part, the following:

> ***A rezoning of the Project's Mine/Concentrator property from agricultural use to industrial use will be required prior to a construction decision. Additionally, a Conditional Use Permit (CUP) issued by Gaston County will be required. The Company has held initial meetings with the Gaston County planning office and the Economic Development Commission of Gaston County. The Company is not aware of any reason why rezoning and a CUP would not be granted.***

81.     The statements referenced above were materially false and misleading because the Individual Defendants knew, or recklessly disregarded, but failed to disclose, that they did not consult, or plan to consult, the Commissioners – the regulatory body that controls, and has final say over, the crucial zoning decisions referenced above. As stockholders later learned, at the time these statements were made, Piedmont had not consulted the Gaston County Commissioners nor provided them with details of the Company's plans, including the levels of dust, noise and vibrations that were expected to occur, or how water and air quality were expected to be affected. Indeed, as defendant Phillips later conceded: "We've known from day one, we can't do anything without [the Commissioners] rezoning this property" and "we haven't done as good a job – and I blame myself – with the community, the Commissioners, et cetera[.]" Additionally, as defendant Phillips later admitted, the details of the Company's plans were not sufficiently known such that they could be presented to the Commissioners until July 2021, ***nearly three years after these statements were made***. Thus, the Individual Defendants had no basis to claim at this point that they were "not aware" of any reason why rezoning would not be granted.

82.     On September 26, 2018, the Individual Defendants caused the Company to file its 2018 Annual Report as part of a Form 6-K filed with the SEC and signed by defendant Czachor. The Company's 2018 Annual Report included a "Message from the CEO" from defendant Phillips which stated the following, in pertinent part, regarding the Company's government relations:

> The Scoping Study reinforced the fundamental advantages of our location in North Carolina, USA:…
>
> •       Stable and investment friendly jurisdiction – stable legal regime, established permitting process for mining operations, with low corporate taxes and no state mining royalties.
>
> While our results to date have laid a solid foundation for our success, it is Piedmont's future which I find most exciting. We have several important activities already underway or pending over the coming months, including: . .

• Permitting – w*e are actively engaged with local, state and federal regulators* in advance of a comprehensive permitting submission targeted for late-2018;

83.     This statement was materially false and misleading because the Individual Defendants knew, or recklessly disregarded but failed to disclose that the Company was not, and had not, actively engaged with the Commissioners. The Commissioners, who control zoning changes necessary for the Carolina Lithium Project to proceed, had been "completely left in the dark" regarding the Carolina Lithium Project. As defendant Phillips later conceded: "Maybe it would have been better had (Commissioners) been in the loop constantly. We didn't really have the time or resources to do it and we didn't even know what to tell them[.]" Additionally, the statement regarding the "established permitting process for mining operations" was materially false and misleading when made because the Individual Defendants did not consult the Commissioners before making this statement. Thus, the Individual Defendants had no basis to make this claim. In fact, as further explained below, subsequent to the Company's meeting with the Commissioners, the Commissioners imposed additional mining restrictions, including a special use permit, since a mine of Piedmont's anticipated size, magnitude, and depth was not previously anticipated in the existing regulations.

84.     On October 31, 2018, the Individual Defendants caused Piedmont to file with the SEC its Annual Report for the year ended June 30, 2018 on Form 20-F (the "2018 20-F"). The 2018 20-F was signed by defendant Phillips. The statements below were repeated in the October 30, 2019 Annual Report for the year ended June 30, 2019 filed with the SEC on Form 20-F (the "2019 20-F") and incorporated by reference in the June 2020 Registration Statement; the October 13, 2020 Annual Report for the year ended June 30, 2020 filed with the SEC on Form 20-F (the "2020 20-F") and incorporated by reference in the October 2020 Registration Statement and March

2021 Registration Statement; and the June 9, 2020 prospectus filed with the SEC on Form 424B5

in connection with the June 2020 Offering:

> Private parties, such as environmental activists, frequently attempt to intervene in the permitting process and to persuade regulators to deny necessary permits or seek to overturn permits that have been issued. Obtaining the necessary governmental permits involves numerous jurisdictions, public hearings and possibly costly undertakings. These third-party actions can materially increase the costs and cause delays in the permitting process and could cause us to not proceed with the development or operation of a property. ***In addition, our ability to successfully obtain key permits and approvals to explore for, develop, operate and expand operations will likely depend on our ability to undertake such activities in a manner consistent with the creation of social and economic benefits in the surrounding communities, which may or may not be required by law.*** Our ability to obtain permits and approvals and to successfully operate in particular communities may be adversely affected by real or perceived detrimental events associated with our activities.

85. This statement was materially false and misleading because the Individual

Defendants knew, or recklessly disregarded but failed to disclose that the Company had not taken

adequate steps to ensure that its agents would conduct "activities in a manner consistent with the

creation of social and economic benefits in the surrounding communities[.]" As stockholders later

learned, the Company and/or its agents "bullied" local landowners and employed a strategy of

strong-arm tactics to induce landowners to sell their property, thereby angering the local

population, as well as elected and appointed officials. Indeed, defendant Phillips conceded: "we

haven't done as good a job – and I blame myself – with the community[.]" The Company's failure

to create social and economic benefits in the local community resulted in a petition signed by more

than 1,500 individuals asking officials to block the mine. Additionally, the Individual Defendants'

tactics resulted in a finding by the Commissioners that the Company was placing its interests over

the interests of the citizens of Gaston County and could not be trusted, without adequate local

controls, to protect the health, safety, and general welfare of Gaston County citizens.

86.     On January 10, 2019, the Individual Defendants cause Piedmont to issue a press release entitled "Piedmont Lithium Submits Permit Applications" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits, as well as quoting Defendant Phillips with regards to government relations:

> Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019.
>
> Keith D. Phillips, President and Chief Executive Officer, commented: "This application is one more step towards the realization of our goal of producing battery- grade lithium hydroxide in North Carolina. An immense amount of preparatory work was completed by our team and our consulting advisors, and we look forward to a ***continued constructive engagement*** with the appropriate regulatory bodies."

87.     The statement "we look forward to a continued constructive engagement with the appropriate regulatory bodies" above was materially false and misleading because the Individual Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not engaged with the Commissioners at the time this statement was made, had no immediate plans to do so, and, ultimately, would not do so for over two years after this statement was made.

88.     On August 7, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Updated Scoping Study Extends Project Life and Enhances Exceptional Economics" which stated the following, in pertinent part, regarding the Company's relationships:

> ***Piedmont maintains an active community engagement program including local, state, and federal elected officials***, community groups, private individuals, and local media. Community engagement will continue through the permitting, development, and operations phases of the Project.
>
> \*       \*       \*
>
> ***A Conditional District (CD) for the Project's Mine/Concentrator approved by Gaston County will be required. The Company has held initial meetings with the Gaston County planning office and the Economic Development Commission of Gaston County. The Company is not aware of any reason why rezoning and a CD would not be granted.***

89.     The Individual Defendants' statements above regarding the Company's active community engagement program were materially false and misleading because it did not exist at that time. Similarly, the statement that the Company is "not aware of any reason why rezoning and a CD would not be granted" is materially false and misleading because, again, the Company had to that point not had any engagement with the Gaston County planning office.

**B.      False Statements Regarding Permit Application and Rezoning Applications**

90.     On July 19, 2018, the Individual Defendants caused the Company to issue a press release entitled "Scoping Study Delivers Outstanding Results" which stated the following, in pertinent part, regarding the Company's need, and plan, for proper permits:

Environmental and Social Impact Assessment

HDR Engineering has been retained by Piedmont to support permitting activities on the project. HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities….

* * *

Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 8.

| Table 8: Estimated Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
| --- |---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | ▓ | ▓ | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | |
| 404 Permit Application Preparation | | | | | | | | | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| 404 Permit Review and Approval Process | | | | | | | | | | | | | □ | □ | □ | □ | □ | □ | □ | □ | □ | □ | □ | □ |
| Mining Permit Application Preparation | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | □ | □ | □ | □ | □ | | | | | | | |

91.     This statement was materially false and misleading because the Individual Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities, and that Piedmont repeatedly failed to inform or consult relevant authorities regarding its specific plans. As stockholders later learned, the Individual Defendants *cancelled* their meeting with the Commissioners in March 2021 because they "weren't ready to present in March." The Individual Defendants "didn't know" their plans in March 2021 and "very important components that are now part of [the] plan weren't finalized then[.]" And, admittedly, the Individual Defendants "didn't even know what to tell" the Commissioners until their presentation in July 2021, meaning that the stated timelines above regarding the state mining permit and rezoning activities were lacking in a reasonable basis at all relevant times. Further, without meeting with the Commissioners, the Individual Defendants had no good faith basis or reasonable belief to claim that the Company would apply for or complete rezoning activities in the stated timelines, especially since they later conceded they knew "from day one," that they "can't do anything without [the Commissioners] rezoning this property." As stated above, the Individual Defendants repeatedly misled stockholders as to the level and nature of the Company's relationship with the Commissioners. However, as stockholders learned on July 20, 2021, the Company could not submit its rezoning application until it first had its state mining permit "in hand." The state mining permit review process "could stretch for more than a year" and the Company had yet to submit the application.

92.     On July 23, 2018, the Individual Defendants caused the Company to file a presentation as part of a Form 6-K filed with the SEC signed by defendant Czachor which provided the following slide showing the Company's purported "Rapid Development Timeline":



93.     On September 13, 2018, the Individual Defendants caused the Company to issue a press release entitled "Updated Scoping Study Improves Project Economics" which stated the following, in pertinent part, regarding the Company's need for and plan for proper permits:

Environmental and Social Impact Assessment

HDR Engineering has been retained by Piedmont to support permitting activities on the project. HDR completed a critical issues analysis of the Project in February 2018 which identified the various local, state, and federal permits which will be required to commence mining and concentrator activities….

*     *     *

HDR started preparation of a 404 permit application and mining permit application in September 2018.

Piedmont's overall permitting timeline for the mine and concentrator is shown in Table 19.



94.     On September 18, 2018, the Individual Defendants caused the Company to file a presentation as part of a Form 6-K filed with the SEC signed by defendant Czachor, which provided the following slide showing the Company's purported "Rapid Development Timeline":

95.     On September 26, 2018, the Individual Defendants caused the Company to file its 2018 Annual Report as part of a Form 6-K filed with the SEC and signed by defendant Czachor. The Company's 2018 Annual Report stated the following, in pertinent part, regarding the Company's need, and plan, for proper permits. These statements were repeated in the October 31,

2018 press release that the Individual Defendants caused Piedmont to issue, entitled "September 2018 Quarterly Report":

> **Commenced permitting on the Project for all federal, state and local permits, which is targeted for completion in 2019[.]**
>
> \*       \*       \*
>
> Complete permit applications and secure the necessary permits to commence mining and processing operations at the Project[.]

96.     On October 31, 2018, the Individual Defendants caused Piedmont to file the 2018 20-F with the SEC. The statements below were repeated in the 2019 20-F and incorporated by reference in the June 2020 Registration Statement; and the 2020 20-F and incorporated by reference in the October 2020 Registration Statement and March 2021 Registration Statement.

**Permitting**

\*       \*       \*

> Prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits authorizing, among other things, any mine development activities and mine operating activities. Obtaining and renewing governmental permits is a complex and time-consuming process and involves numerous jurisdictions, public hearings and possibly costly undertakings. **The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations.** Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties. See "Risk Factors—We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming."

**Specialized Skill and Knowledge**

> **We rely on specialized skills and knowledge** to gather, interpret and process geological and geophysical data, **successfully permit** and then design, build and operate extraction facilities and **numerous additional activities** required to extract lithium. We expect to employ a strategy of contracting consultants and other service providers to supplement the skills and knowledge of our permanent staff in order

to provide the specialized skills and knowledge to undertake our lithium operations effectively.

97.    These documents stated the following regarding "risks." The statements were also repeated in the June 9, 2020 prospectus filed with the SEC on Form 424B5 in connection with the June 2020 Offering:

> *We will be required to obtain governmental permits in order to conduct development and mining operations, a process which is often costly and time-consuming.*
>
> We are required to obtain and renew governmental permits for our exploration activities and, prior to developing or mining any mineralization that we discover, we will be required to obtain new governmental permits. Obtaining and renewing governmental permits is a complex and time-consuming process. *The timeliness and success of permitting efforts are contingent upon many variables not within our control, including the interpretation of permit approval requirements administered by the applicable permitting authority. We may not be able to obtain or renew permits that are necessary to our planned operations or the cost and time required to obtain or renew such permits may exceed our expectations.* Any unexpected delays or costs associated with the permitting process could delay the exploration, development or operation of our properties, which in turn could materially adversely affect our future revenues and profitability. In addition, key permits and approvals may be revoked or suspended or may be changed in a manner that adversely affects our activities.

98.    On December 3, 2018, the Individual Defendants caused Piedmont to issue a press release entitled "Placement to Raise A$12 million" in which defendant Phillips stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits. This statement was repeated in the July 3, 2019 press release entitled "Institutional Placement to Raise A$21 million":

> Mr. Keith Phillips, President and CEO, said: . . . *"We have an exciting year ahead and securing these funds will allow us to maintain our ambitious development timetable for what we believe to be the world's most strategically located lithium project."*

99.    On December 6, 2018, the Individual Defendants caused the Company to file a presentation as part of a Form 6-K filed with the SEC signed by defendant Czachor, which

provided the following slide showing the Company's purported "Indicative Development Timeline":



100.   On January 10, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Lithium Submits Permit Applications" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits:

Piedmont Lithium Limited ("Piedmont" or "Company") is pleased to announce that it has submitted a Section 404 Standard Individual Permit application to the US

Army Corps of Engineers (USACE) for the Company's Piedmont Lithium Project located in the historic Carolina Tin-Spodumene Belt in North Carolina, USA...

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources (NCDWR)...

*These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.*

| Previously Announced Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | ░ | ░ | ░ | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| 404/401 Permit Application Preparation | | | | | | | | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | |
| 404/401 Permit Review and Approval Process | | | | | | | | | | | | | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ |
| Mining Permit Application Preparation | | | | | | | | | | | | | ■ | ■ | ■ | ■ | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ | ▨ |

*Piedmont expects to submit the balance of permit applications required to commence mining operations to various state and local agencies within the first half of 2019.*

101.    On January 30, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "December 2018 Quarterly Report" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits:

**Submission of Permit Applications**

During the quarter, the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers ("USACE") for the Project…

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources ("NCDWR")…

***These important applications were completed and submitted*** in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.

| Previously Announced Permitting Timeline for Piedmont Lithium's Mine / Concentrator | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | | | | | | | | | | | | 2019 | | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D |
| Critical Issues Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| Stream and Wetland Delineation | | | | | | | | | | | | | | | | | | | | | | | | |
| Threatened and Endangered Species Survey | | | | | | | | | | | | | | | | | | | | | | | | |
| Baseline Surface Water Sampling | | | | | | | | | | | | | | | | | | | | | | | | |
| Groundwater Sampling and Analysis | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| 404/401 Permit Review and Approval Process | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Application Preparation | | | | | | | | | | | | | | | | | | | | | | | | |
| Mining Permit Review and Approval | | | | | | | | | | | | | | | | | | | | | | | | |

102.    On April 9, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Lithium Project Development Update" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits:

| Piedmont Lithium Project Illustrative Project Schedule | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mine Concentrator Development | 2019 | | | | | | | | | | |
| Task | J | F | M | A | M | J | J | A | S | O | N | D |
| Land Acquisition | | | | | | | | | | | | |
| Geology - Exploration Drilling | | | | | | | | | | | | |
| Geology - Resource Update | | | | | | | | | | | | |
| Geology - Infill Drilling | | | | | | | | | | | | |
| Geology - Reserve Statement | | | | | | | | | | | | |
| Metallurgy - Concentrator PFS Testwork | | | | | | | | | | | | |
| Metallurgy - Concentrator DFS/Pilot Testwork | | | | | | | | | | | | |
| Engineering - Updated Scoping Study | | | | | | | | | | | | |
| Engineering - DFS Engineering | | | | | | | | | | | | |
| Permitting - Rule 404 Permitting | | | | | | | | | | | | |
| Permitting - NC State Mining Permit | | | | | | | | | | | | |
| Permitting - Community Engagement | | | | | | | | | | | | |
| Offtake, Financing and Strategic Discussions | | | | | | | | | | | | |

Keith D. Phillips, President and Chief Executive Officer, said[:] ***"We continue to make good progress in several areas critical to our strategy, and remain on-track to begin construction in early-2020, consistent with the schedule we established in late-2017."***

\*       \*       \*

**Permitting Activities Proceeding as Anticipated**

The public comment period for the Company's Section 404 Standard Individual Permit application to the US Army Corps of Engineers (USACE) concluded in

February 2019. Piedmont has received the comments from USACE and other regulatory agencies and will provide responses by May 31, 2019. **Piedmont is also proceeding with state and local permit applications.** The Company will undertake a series of community engagement meetings in the coming months and **anticipates applying for a North Carolina state mining permit and Gaston County conditional zoning in Q3 2019.**

The federal and state reviews are both proceeding as expected and the Company remains confident that the permitting processes will be successfully concluded by year-end 2019.

103.    On April 30, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "March 2019 Quarterly Report" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits:

**Submission of Permit Applications**

During the quarter, the Company submitted a Section 404 Standard Individual Permit application to the US Army Corps of Engineers for the Project…

The Company also concurrently submitted an application for a Section 401 Individual Water Quality Certification to the North Carolina Division of Water Resources...

**These important applications were completed and submitted in accordance with the Company's previously announced estimated permitting timeline (refer to updated Scoping Study announced September 13, 2018), allowing Piedmont to maintain its overall project development schedule.**

104.    On May 28, 2019, the Individual Defendants caused the Company to file a corporate presentation as part of a Form 6-K filed with the SEC signed by defendant Czachor, which provided the following slide showing the Company's purported "Near-Term Catalysts":

105. A similar slide making similar representations was filed on June 26, 2019, as part of a Form 6-K filed with the SEC, signed by defendant Czachor.

106. On August 7, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Updated Scoping Study Extends Project Life and Enhances Exceptional Economics" which stated the following, in pertinent part, regarding the Company's purported progress with, and plan for, proper permits:

**Conclusions and Next Steps**

The Scoping Study demonstrates the integrated Project's strong commercial potential, and now puts Piedmont in a strong position to engage in discussions around future financing of the Project, including with prospective strategic and off-take partners. ***The Company will now concentrate on the following initiatives to create additional value in the Project***:…

- Secure the necessary permits and approvals for the Mine/Concentrator[.]

\*      \*      \*

***Waste disposal areas on the Project have been designed to a detail sufficient for permit approvals.…***

\*      \*      \*



*Figure 5 – Waste rock disposal areas have been designed to sufficient detail for permit applications and approval.*

### Site Plans

### Mining Operations

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Marshall Miller and Primero Group during the course of this Scoping Study. ***The site plan has been developed to a pre-feasibility level of detail and with sufficient definition to acquire permits*** (Figure 11).…



**Figure 11 – Overall Mine/Concentrator Site Plan**

\*　　\*　　\*

*A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months.*

*Background studies undertaken in support of permit applications have been constructive, and the conclusions reached in each individual study to date have met the requirements which would normally support permit approval.*

\*　　\*　　\*

*Piedmont has completed all necessary background studies required for the submission of all permit applications for the project as of July 2019.*

107.    On August 14, 2019, the Individual Defendants caused Piedmont to issue a press release, attached to the Form 6-K, entitled "Scoping Study Update – August 2019" which included the following slide, in pertinent part, regarding the Company's "Near-Term Catalysts" and stating that "Permitting is well-advanced":

## USA's Only Conventional Lithium Project

| IDEAL LOCATION | • >50 years of lithium processing in North Carolina<br>• Abundant infrastructure and lithium talent pool<br>• Pure spodumene mineralogy on TSB |
| --- | --- |
| EXCEPTIONAL ECONOMICS | • 25-year project life<br>• NPV of US$1.45B and IRR of 34%<br>• Steady-state EBITDA of US$298M |
| NEAR-TERM CATALYSTS | • Permitting is well-advanced<br>• Exploration drilling and LiOH testwork in H2 2019<br>• Strategic and offtake discussions underway |
| VALUATION UPSIDE | • Sector at 2-year lows despite strong demand outlook<br>• PLL trading at ~5% of NPV<br>• Recent M&A deals imply huge upside |

PIEDMONT                                                        ASX:PLL; NASDAQ:PLL        2

108.    A similar slide making similar representations was filed on September 17, 2019, as part of a Form 6-K filed with the SEC signed by defendant Czachor.

109.    On November 26, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Lithium Receives Federal Permit to Develop Mine" which quoted defendant Phillips stating the following regarding the Company's purported progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "Securing a Section 404 Individual Permit is a major milestone for any natural resource project in the United States, and we are very pleased to have received this authorization. I want to thank our team members and advisors who have worked so diligently and cooperatively throughout this rigorous process, and also express our thanks to the Army Corps of Engineers for the highly professional manner in which they have approached this Project from day one. We will now move forward with the

40

permitting of our chemical plant operations during 2020. Our project is unique in being the only spodumene-to-hydroxide project in the United States, and now also

 stands out as the most advanced American lithium project from a permitting perspective. ***We are very excited about the important milestones ahead of us as we look to deliver a DFS for a fully permitted integrated project by the end of 2020.***"

110.    On December 4, 2019, the Individual Defendants caused Piedmont to issue a press release entitled "Hatch Appointed to Deliver PFS for Piedmont's Lithium Hydroxide Project in North Carolina" which quoted defendant Phillips stating the following regarding the Company's purported progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "We are very pleased to be working with Hatch on the PFS for our lithium hydroxide project. Hatch has unsurpassed lithium processing experience, having studied directly comparable projects for several clients. ***Having recently received a landmark permit for our mine/concentrator we are moving full-speed ahead to having a shovel-ready project by the end of 2020.***"

111.    On February 26, 2020, the Individual Defendants caused Piedmont to issue a press release entitled "Hydroxide Testwork Program Proceeding Favorably" which quoted defendant Phillips stating the following regarding the Company's purported progress with and plan for proper permits:

> Keith D. Phillips, President and Chief Executive Officer, commented: "We are very encouraged by the positive results generated thus far in the lithium hydroxide testwork program, and expect the final results to be announced in the near future. The optimization tests performed by SGS will allow us to refine the proposed Chemical Plant flowsheet and will underpin the prefeasibility study targeted for completion in Q2 2020. Completion of the PFS, ***along with continued advances on the permitting and offtake fronts, position us to advance our Project to shovel-ready status by the end of the year***, well-timed for the recovery in lithium prices and market sentiment that many observers are forecasting for the remainder of this year."

112.    On May 26, 2020, the Individual Defendants caused Piedmont to issue a press release entitled "Chemical Plant PFS Demonstrates Exceptional Economics and Optionality of

USA Location" which stated the following, in pertinent part, regarding the Company's purported

progress with and plan for proper permits:

**2.10 Mine / Concentrator Site Plan**

A preliminary integrated site plan including mining operations, waste disposal, and concentrator was developed by Marshall Miller and Primero Group during the course of Mine/Concentrator design and Integrated Project Scoping Study. ***The site plan has been developed to a pre-feasibility level of detail and with sufficient definition to acquire permits (Figure 22).***



Figure 22 - Overall Mine/Concentrator Site Plan

*       *       *

**2.14 Permitting**

HDR Engineering has been retained by Piedmont to support permitting activities on the Integrated Project. ***Permitting activities for the Mine/Concentrator are well advanced…***

***A mining permit application and rezoning application will be submitted to the state of North Carolina and Gaston County, respectively, in the coming months.***

113.    On December 3, 2020, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Receives Key Permit for Chemical Operations" which stated the following, in pertinent part, regarding the Company's purported progress with and plan for proper permits:

Combined with the Section 404 Standard Individual Permit received in November 2019 from the US Army Corps of Engineers for the Company's planned concentrate operations, Piedmont now holds all of the federally-regulated permits required for the construction of the integrated project. ***The Company expects to apply for a North Carolina State Mining Permit and to complete local rezoning processes for the integrated project in the first half of 2021.***

Keith D. Phillips, President and Chief Executive Officer, commented: "Securing our Title V Air Permit represents a major milestone for our integrated lithium hydroxide business, and we are very pleased to have received this authorization. Our project is unique in being the only spodumene-to-hydroxide project in the United States, and together with our previously received federal permit for our concentrate operations now also stands out as the most advanced American lithium project. ***We are very excited about the important milestones ahead of us as we look to deliver a DFS for a fully permitted integrated project next year.***"

114.    On January 11, 2021, the Individual Defendants caused Piedmont to issue a press release entitled "Piedmont Lithium Announces Strategic Investment in Quebec Hard-Rock Lithium Developer Sayona Mining" which quoted defendant Phillips stating the following regarding the Company's purported progress with and plan for proper permits:

"This is a very exciting step for Piedmont***.… 2021 will be an important year for our Piedmont Lithium Project***, *as we* plan to expand our mineral resources, ***finalize permitting***, execute additional lithium offtake agreements, complete an

43

integrated definitive feasibility study, and secure strategic project financing. *We are fortunate to have a strong balance sheet to comfortably fund the Sayona investments without compromising our aggressive plans in North Carolina.*"

115.    On January 29, 2021, the Individual Defendants caused Piedmont to issue a press release entitled "December 2020 Quarterly Report" which quoted defendant Phillips stating the following regarding the Company's purported progress with and plan for proper permits:

> Following our highly successful equity offering in October, Piedmont enters 2021 with a strong balance sheet that will enable the Company to meet its development objectives for the coming year. Our expanded team continues to do a great job on the ground in North Carolina in mineral exploration, metallurgical testwork, technical studies, and permitting that may make it possible for Piedmont to begin construction of our project by the end of this year. We expect 2021 will be a pivotal year for Piedmont Lithium, and we are excited about the months ahead.
>
> *                *                *
>
> Combined with the Section 404 Standard Individual Permit received in November 2019 from the US Army Corps of Engineers for the Company's planned concentrate operations, Piedmont now holds all of the federally-regulated permits required for the construction of the integrated project. The Company expects to apply for a North Carolina State Mining Permit and to complete local rezoning processes for the integrated project in the first half of 2021.

116.    The statements referenced in this subsection were materially false and misleading because at the time they were made, the Individual Defendants knew, or recklessly disregarded, but failed to disclose that Piedmont had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities and that Piedmont repeatedly failed to inform or consult relevant authorities regarding its specific plans. As stockholders later learned, the Individual Defendants cancelled their meeting with the Commissioners in March 2021 because they "weren't ready to present in March." The Individual Defendants "didn't know" their plans in March 2021 and "very important components that are now part of [the] plan weren't finalized then[.]" The Individual Defendants admittedly "didn't even know what to tell" the Commissioners until their presentation in July 2021, meaning that the

stated timelines in the above statements concerning the state mining permit and rezoning activities were lacking a reasonable basis at all relevant times. Further, without meeting with the Commissioners, the Individual Defendants had no good faith basis or reasonable belief to claim that the Company would apply for or complete rezoning activities in the stated timelines, especially since they conceded they knew "from day one," that they "can't do anything without [the Commissioners] rezoning this property." As stated above, the Individual Defendants misled stockholders as to the level and nature of the Company's relationship with the Commissioners. However, as stockholders learned on July 20, 2021, the Company could not submit its rezoning application until it first had its state mining permit "in hand." The state mining permit review process "could stretch for more than a year" and the Company had yet to submit the application.

### C.    Violations of Item 303 and 105 of Regulation S-K

117.  In addition to the materially false and misleading statements identified above, the Individual Defendants also violated their affirmative obligations to provide certain material information as required by applicable SEC rules and regulations.

118.  Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

119.  In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

*     *     *

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

120.     Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

121.     The failure by the Individual Defendants to disclose that the timelines and completion of the Carolina Lithium Project remained uncertain due to the fact that the Individual Defendants had not taken the necessary steps to timely obtain or file the applications for the North Carolina state mining permit or discuss or present the Carolina Lithium Project's plans with the Commissioners violated Item 303 because these undisclosed adverse events and/or uncertainties were known to management and would and did have a material impact on the Company's financial condition, results and net income from continuing operations.

122.     In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the Company's "Risk Factors," a "discussion of the material factors that make an investment in the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered." The Individual Defendants failed to adequately describe the risks of Carolina Lithium Project delays or completion arising from their failure to take the necessary steps

to timely obtain or file the applications for the North Carolina state mining permit and Gaston County rezoning activities and failure to inform or consult relevant authorities regarding the Company's specific plans, despite the fact that these risks were admittedly known and already affecting the Company.

## VII.   EVENTS FOLLOWING THE *REUTERS* ARTICLE CONFIRM THE INDIVIDUAL DEFENDANTS' MISCONDUCT

123.    The fallout from the revelations of the truth first disclosed in the July 20, 2021 *Reuters* article continued to reverberate after its publication. On August 2, 2021, *Reuters* reported that Piedmont would be delaying the first shipments of lithium chemicals to Tesla and there was no definitive date for when deliveries could begin.[3]

124.    On August 6, 2021, the Commissioners held a special meeting and unanimously voted to approve a 60-day development moratorium on mining activities to rework regulations in the UDO. The Commissioners concluded that a mine of Piedmont's anticipated size, magnitude, and depth was not anticipated in existing regulations; the process of lithium mining poses an imminent and substantial threat to public health and safety; and that, based on reliable complaints from neighboring citizens that the Company and its agents had used abusive and threatening communications to strong-arm residents into selling their land, the Company had placed its own interests over the interests of the citizens of Gaston County and could not be trusted, without adequate local controls, to protect the health, safety, and general welfare of Gaston County's citizens.

---

[3] Ernest Scheyder, Piedmont Lithium delays timeline to supply Tesla, REUTERS (Aug. 2, 2021), https://www.reuters.com/business/energy/piedmont-says-has-delayed-timeline-supply-lithium-tesla- 2021-08-02/.

125. On August 30, 2021, the Individual Defendants caused the Company to announce that it filed an application for a North Carolina state mining permit with the North Carolina DEQ Division of Energy, Mineral and Land Resources.

126. On September 28, 2021, the Commissioners unanimously approved new mining restrictions in the UDO, requiring new mines and quarries to operate on industrially-zoned (I-3) property and a special use permit considered and issued by the Commissioners, which first must be recommended by the county planning board. At least two public information meetings must be held before a special use permit is granted. Additionally, if rezoning is required to establish an industrially-zoned (I-3) district, then the application for a special use permit shall only be filed and accepted after approval of the rezoning of the property.

127. Further, pursuant to Section 8.3.21 of the UDO, the owner of the mine must provide Gaston County a copy of their state mining permit within thirty days of issuance; no blasting shall be conducted until one hour after sunrise or within one hour of sunset, Sundays, and specified holidays; the perimeter of any mine or quarry pits must be at least 500 feet from any occupied structure; deliveries of specified materials including minerals, metals, and ores shall not occur between the hours of 10:00 PM and 6:00 AM; mining and quarrying facilities shall have a security fence surrounding the area of operations; and the owner of the mine must submit a noise mitigation plan for approval by the Commissioners.

128. On November 15 and 18, 2021, due to significant public interest, the North Carolina DEQ Division of Energy, Mineral, and Land Resources held public hearings in connection with the Company's North Carolina state mining permit application. The Company has since received requests for additional information from the North Carolina DEQ Division of Energy, Minerals, and Land Resources.

129.    On February 7, 2022, *WCNC Charlotte* published an article entitled "'Sorry for my frankness, but let's get to it' | Emails detail growing frustration between Gaston County commissioners, Piedmont Lithium" which reported the following, in pertinent part, regarding the Company's regulatory issues in North Carolina:

> As Piedmont Lithium was touting progress toward eventually mining lithium near Cherryville, Gaston County commissioners were privately criticizing the company and voicing alarm about the mine's impacts, according to a WCNC Charlotte Defenders investigation.
>
> Piedmont Lithium has claimed their mine, which would sell lithium it extracted to electric car companies like Tesla, would result in hundreds of millions of dollars of economic investment.
>
> ***However, county commissioners were airing concerns about the mine's impacts on traffic, pollution, and surrounding property values in January 2021, months earlier than previously reported.***
>
> *    *    *
>
> WCNC Charlotte's Defenders team reviewed more than a thousand pages of internal county emails detailing months of conversations between county commissioners, county employees, residents, and Piedmont Lithium's senior leadership.
>
> In January 2021, Commissioner Allen Fraley, whose township would include Piedmont Lithium's mine, if approved, asked the board not to vote on a critical rezoning permit the mine needed until commissioners got all the information they requested from county staff.
>
> "It certainly appears to me that PL [Piedmont Lithium] is acting in a manner this is a done deal and will get a 'rubber stamp' approval," Commissioner Fraley wrote. ***"I don't think that will be the case."***
>
> Commissioner Tracy Philbeck responded, ***"As of now, Gaston County gets the hole, the mess, the traffic, the environmental consequences and that is about it."***
>
> Commissioner Tom Keigher, who was the board's chairman last year, followed up by saying he ran into former county attorney Chuck Moore who, ***"agrees with us about concerns. [The] company is acting flippant."***
>
> *    *    *
>
> On April 19, 2021, Malissa Gordon, who worked for Gaston County's Economic Development Commission before becoming Piedmont Lithium's community and

government relations manager, emailed an update on the company's progress toward building the mine.

Commissioner Chad Brown replied, *"Why are we the last to know the plans of this organization? We yet have heard anything of substance but everyone else has. I have been asked more from people for or against this site but nothing from Piedmont. It's hard to say or tell anyone other than no one has presented ANYTHING to us."*

Gordon wrote back, *"We know we haven't taken the right steps or direction as far as informing you all about the project.* It truly hasn't been to hide anything or to make you think we can do this project without the support of Gaston County."

She continued, *"Again, we know this hasn't been the best start with you all as far as communication and we apologize for that."*

Brian Risinger, Piedmont Lithium's vice president of corporate communications and investor relations, sent similar update emails in May and June.

In response to one of the emails, Commissioner Brown wrote, *"Frankly, I'm tired of seeing this continue through email...we should have been the first stop, not the last."*

Commissioner Keigher also responded to one of Risinger's emails by writing, *"Sorry for my frankness, but let's get to it. I see no more need [for] messages that have no real info."*

Following the July 20 meeting, Gaston County commissioners voted on Aug. 6 to place a 60-day moratorium on all mining activities in the county.

Commissioners had previously hired Tom Terrell, who has expertise in the mining industry, to represent them in communications with the company.

Following the moratorium vote, Piedmont Lithium responded with a press release on Aug. 9, saying, "The Company looks forward to constructive engagement with the county commissioners and staff on the many important matters subject to their review."

The next day, Terrell, emailed Piedmont Lithium's attorneys, "*Not to be testy, but Piedmont Lithium has shared an abundance of information with an abundance of people, and I've received nothing. I don't even know what I don't know. If your client wants a seat at the table, it needs to be pro-active and creative in figuring out what I need from you*."[4]

---

[4] 'Sorry for my frankness, but let's get to it' | Emails detail growing frustration between Gaston Countycommissioners, Piedmont Lithium, WCNC (Feb. 7, 2022)

130.     Uncovered emails reviewed by *WCNC Charlotte* included an April 20, 2021 email from Malissa Gordon to Commissioner Chad Brown stating: "One thing I am learning since starting here in August is this project certainly isn't like most we have worked on together while at the [Economic Development Commission]. This is a different type of project, with many moving pieces as far as land and components of the operation that were constantly changing up to this point." *Id*.

131.     The Company remains in pre-application consultation with the Commissioners.

## VIII.  INSIDER SALES

132.     Defendants Phillips and Brindle both sold substantial portions of their personally-held shares of Piedmont stock on July 5-6, 2021 based on their possession of material, adverse, non-public information. Defendants Phillips and Brindle sold their shares a mere two weeks before the July 20, 2021 *Reuters* article was published, which was the first time that stockholders learned that the Commissioners had not previously been spoken with, or provided information about, the Carolina Lithium Project. Importantly, these sales took place two weeks before both Phillips and Brindle made the Company's first public presentation to the Commissioners, which, independent of the *Reuters* article, would have informed stockholders that the Carolina Lithium Project, in truth, did not benefit from strong local government support.

133.     On July 5-6, 2021, defendant Phillips completed his first reported sales of Piedmont stock, selling approximately 13.19% of his personally-held shares over the course of two days, for gross proceeds of approximately $1.97 million. These transactions were highly unusual as they represented defendant Phillips' first reported sales in the Company and occurred a mere two weeks before he was set to present the Carolina Lithium Project to the Commissioners. Likewise, on July

---

https://www.wcnc.com/article/news/investigations/investigators/emails-gaston-county-commissioners-piedmont-lithium/275-e8f3b65f-13a2-4990-976e-6594ca3f365d.

6, 2021, defendant Brindle, the Carolina Lithium Project Manager and co-presenter before the Commissioners, made his first sales of Piedmont stock, selling approximately 31.93% of his personally held shares on that single day for gross proceeds of approximately $1.49 million.

134.   If defendants Phillips and Brindle had actually believed the positive statements detailed herein, it would have been economically irrational for them to sell substantial portions of their personally-held shares just two weeks before they were both set to present the Carolina Lithium Project to the Commissioners, since the value of their shares would have increased following a favorable reception from the Commissioners and affirmance to stockholders that the Carolina Lithium Project was proceeding at the pace the Individual Defendants represented. By selling substantial portions of their personally-held shares near Relevant Period highs for proceeds of approximately $1.97 million and $1.49 million, respectively, defendants Phillips and Brindle were able to capitalize on the inflated value of their shares before stockholders were apprised of the true state of affairs.

135.   Accordingly, defendants Phillips and Brindle were motivated to engage in the aforementioned scheme to allow them to collectively sell 46,080 shares of their personally-held Piedmont stock for proceeds of approximately $3.46 million as follows:

| Insider | Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| Defendant | 7/5/2021 | $76.92 | 4,000 | $307,680 |
| Phillips | 7/6/2021 | $77.66 | 3,500 | $271,810 |
| (CEO, President) | 7/6/2021 | $71.95 | 4,445 | $319,818 |
| | 7/6/2021 | $74.88 | 1,622 | $121,455 |
| | 7/6/2021 | $73.75 | 2,258 | $166,528 |
| | 7/6/2021 | $78.04 | 3,158 | $246,450 |
| | 7/6/2021 | $77.22 | 3,624 | $279,845 |
| | 7/6/2021 | $72.66 | 1,620 | $117,709 |
| | 7/6/2021 | $76.20 | 1,853 | $141,199 |
| | | | **26,080** | **$1,972,494** |
| Patrick Brindle | 7/6/2021 | $71.00 | 10,000 | $710,000 |
| (Project Manager, | 7/6/2021 | $78.02 | 5,500 | $429,110 |

| | | | | |
|---|---|---|---|---|
| Chief Development Officer) | 7/6/2021 | $77.23 | 4,500 | $347,535 |
| | | | **20,000** | **$1,486,645** |
| | **Total:** | | **46,080** | **$3,459,139** |

## IX.   DAMAGES TO PIEDMONT

136.   As a direct and proximate result of the Individual Defendants' conduct, Piedmont has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a.   Any funds paid to settle the related Securities Action;

b.   Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Piedmont.

137.   In addition, Piedmont's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired. The Individual Defendants still have not fully admitted the nature of the false statements they caused Piedmont to make, and the true condition of the Company's business. The credibility and motives of management are now in serious doubt.

138.   The actions complained of herein have irreparably damaged Piedmont's corporate image and goodwill. For at least the foreseeable future, Piedmont will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Piedmont's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## X.   DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

139.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

140.   Plaintiff is a current stockholder of the Company and was a stockholder of the Company at times relevant to the Individual Defendants' wrongdoing alleged herein.

141. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

142. As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

143. The Board currently consists of five (5) directors: defendants Phillips, Armstrong, Beristain, Demby and Jones. A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiffs have adequately alleged that there is reason to doubt that at least three (3) current directors of Piedmont are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

## A. Defendant Phillips is Not Independent

144. Defendant Phillips is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Phillips' principal professional occupation is his employment as President and CEO of Piedmont.

145. Accordingly, defendant Phillips is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Phillips is not independent.

## B. A Majority of the Board Members Face a Substantial Likelihood of Liability Based on the Core Product Doctrine

146. The Company's primary product is the Carolina Lithium Project in TSB, according to Piedmont's SEC filings. Accordingly, the truth regarding the permitting timeline and the

deteriorating relationship with local officials was known by each of Phillips, Armstrong, Beristain, Demby and Jones at all relevant times. Withholding this vital information from stockholders was an egregious breach of these defendants' fiduciary duties and not protected business judgment. Under these circumstances, demand on defendants Phillips, Armstrong and Beristain is futile.

### C.   Defendant Phillips Reaped $1.9 Million in Insider Profits, Excusing Demand

147.    While in possession of material, non-public information that the Company had not completed any of the steps necessary to receive zoning/permit approval from either the State of North Carolina or Gaston County for the Carolina Lithium Project, defendant Phillips sold approximately 26,000 shares of Company stock. Had defendant Phillips waited until after the truth was revealed two weeks later in the July 20, 2021 *Reuters* article, he would have received substantially less in proceeds. Defendant Phillips thus received a personal financial benefit from suspicious insider sales which was not shared by other stockholders, excusing demand.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    The Individual Defendants, as current or former Piedmont officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

150.    By virtue of their positions as Piedmont directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

151.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Piedmont in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Piedmont rather than his or her own interests.

152.    By their acts alleged herein, including but not limited to causing Piedmont to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

153.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

154.    Piedmont has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing Piedmont to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision

of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.    Awarding to Piedmont restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: July 5, 2022

**POMERANTZ LLP**
*/s/ Gustavo F. Bruckner*
Gustavo F. Bruckner
Samuel J. Adams
Daryoush Behbood
600 Third Avenue
New York, NY 10016
(212) 661-1100
gfbruckner@pomlaw.com
sjadams@pomlaw.com
dbehbood@pomlaw.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

*Counsel for Plaintiff*

## VERIFICATION

I am a plaintiff in the within action.  I have reviewed the allegations made in this stockholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations to which I have personal knowledge, I believe those allegations to be true.  To those allegations which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __25__ day of __June__ , 2022.

_____
Signature


_____Brad Thomascik_____
Print Name